(41 Misc. Rep. 621.)

### REICH v. COCHRAN et al.

(Supreme Court, Special Term, New York County. November, 1903.)

1 Usury—What Constitutes—Evidence.

Where plaintiff borrowed money to build a hotel on a leasehold, and the creditor thereafter became his partner in the hotel business, and obtained an assignment of the lease as security for the loans, and dispossessed plaintiff for nonpayment of the rent, and the evidence showed that during the pendency of the lease the relation between the parties was that of debtor and creditor, and that the creditor had exacted interest in excess of 6 per cent., sometimes as profits and sometimes as rent, and often by the free use of apartments in the hotel, the transaction between the parties was usurious.

**2. JUDGMENTS—VACATING—NEGLIGENCE OF ATTORNEY.**

  Where the evidence showed that parties to certain judgments had had various litigations between 1892 and 1895, and that an attorney for plaintiff had been guilty of negligence resulting in adjudications against plaintiff, one of which validated the assignment of a lease by plaintiff to the other party, the rule that the remedy for such negligence of the attorney is by separate motions in each particular action or proceeding will be disregarded, and the court will, on terms, set aside, in 1903, the whole series of adjudications, because of such negligence, and declare the assignment of the lease to be a mortgage for advances made to the plaintiff, as was clearly shown by the evidence.

  Action by Lorenz Reich against Eva S. Cochran and others for an injunction. Judgment for plaintiff.

  M. E. Harby (Wheeler H. Peckham, Elliott Danforth, and Sylvan Bier, of counsel), for plaintiff.

  Percy H. Stewart (Samuel Untermeyer, Treadwell Cleveland, and James L. Bishop, of counsel), for defendants.

  GIEGERICH, J. The plaintiff, by this action, seeks to enjoin the defendants from using certain judgments against which relief is asked, and to have certain assignments of a lease declared to be a mortgage instead of assignments, and to be void for usury. Also to recover possession of the leasehold premises, which are used as a hotel, and for an accounting of the rents and profits collected by the defendants since the eviction of the plaintiff. Since the action was tried, the original defendant has died, and the defendants above named have been substituted in his place. For convenience of expression, the word "Cochran" will be used to designate the original defendant.

  The history of the controversy between the plaintiff and Cochran is a long one, and the resulting litigation has been varied and incessant for a period of more than 10 years. The facts necessary to be stated are as follows: On February 14, 1886, the trustees of the Astor will, so called in the action, leased to the plaintiff the premises situated on the southwesterly corner of Fifth avenue and Thirty-Third street, in the city of New York, known by the street numbers 328, 330, 332, and 334 Fifth avenue, and now known as the Cambridge Hotel, for a term of five years, beginning May 1, 1886, at an annual rental of $25,000, with a further agreement to extend the lease at the same rental for an additional term of fifteen years, provided the plaintiff, at the expiration of the five-year term, to wit, on May 1, 1891, should have made improvements upon the premises at a cost of not less than $50,000, and also that if the lease should be subsisting at the expiration of the second term, to wit, on May 1, 1906, and improvements had been made costing not less than $50,000, to pay the plaintiff the value thereof, not exceeding $100,000, or to give him a further lease for a term of twenty years from May 1, 1906, at an annual rental of 5 per cent. upon the fee value of the premises. There was evidence that when the plaintiff obtained this lease he was offered $100,000 for it. The plaintiff, without contradiction, testified that the total cost of equipping the hotel was $550,000. Shortly after obtaining it, the plaintiff had negotiations with Cochran and

his attorney, Fitch, concerning the procuring from him of a loan of $100,000 upon the security of the lease, and in May, 1886, an agreement for such a loan was made. Subsequently, and in September, 1886, the plaintiff applied for an additional loan of $30,000, and received a reply from Fitch saying that Cochran would increase the loan to the sum of $130,000 if the plaintiff would expend at least $165,000 on the proposed improvements. On the 29th day of September, 1886, an agreement was accordingly made for such increased amount on the terms named, the plaintiff at the same time giving Cochran, so the former testified, a paid-up lease for five years for rooms in the hotel at the rate of $5,000 per year. On October 22, 1886, a bond and mortgage dated October 1, 1886, to secure the payment of $130,000, were executed, and Fitch rendered his bill to the plaintiff for $6,500, being 5 per cent. upon the loan, which, together with the disbursements, swelled the total to $7,145.70. A few months afterward, to wit, on April 30, 1887, the plaintiff entered into an agreement with Cochran for the formation of a limited copartnership to carry on the hotel business in the building erected or in course of erection upon the leasehold premises, known as the "Cambridge," for the term of 10 years from May 1, 1887, Cochran contributing $25,000, and agreeing to advance to the copartnership the sum of $45,000 for the purpose of making additional improvements. The agreement further provided that Cochran was to have the suite of three rooms already selected for him for his use without charge, and that the plaintiff should have certain portions of the building for his separate use. At or about the same time another agreement was entered into reciting the lease in question and the plaintiff's intention to expend $215,000 on the premises, various contracts with builders, and the $130,000 bond and mortgage, and that the cost of completing the building would amount to $215,000, and providing that Cochran should increase his loan to $175,000, for which he was to receive 6 per cent. upon all sums actually advanced, and 3 per cent. upon the difference between such advances and the amount agreed upon to be loaned, beginning April 1, 1887, and that all papers were to be prepared by Fitch at the plaintiff's expense. On May 1, 1887, the plaintiff executed to Cochran a bond and mortgage for the $175,000 mentioned, and an agreement by which Cochran was bound to advance money as needed, and was to have 3 per cent. interest from April 1, 1887, on all moneys not advanced, and 6 per cent. on all moneys actually advanced. On June 16, 1887, Cochran wrote the plaintiff as follows: "If you can put in my suite of rooms at ($5,000) five thousand dollars per annum, you may do so, giving me credit on account quarterly, or as payments for the same are received. I will be ready next morning to settle the copartnership special." On the next day, June 18th, Fitch wrote the plaintiff, saying that he had arranged with Cochran to be at Fitch's office "on Monday morning at eleven o'clock to close up matters for the formation of the limited partnership." Subsequently, either in June or September, there being a dispute as to which was the actual date of the execution of the papers, the copartnership articles were signed, by the terms of which the firm was to be known as "L. Reich,"

and the plaintiff was to have two-thirds of the profits and Cochran one-third in addition to receiving 6 per cent. interest on the $25,000 special capital invested by him. At the same time the plaintiff, as he testified, executed a lease to the firm of L. Reich, the consideration being nominal. On June 30, 1887, an agreement was made between Southmayd and others, as trustees of the Astor will, with the plaintiff and Cochran, concerning further insurance on the buildings upon the premises. About October 1st the hotel was opened, and a sign erected bearing the words, "Lorenz Reich, William F. Cochran, Proprietors." On October 1st the plaintiff received a receipted bill from Cochran reciting interest at 6 per cent. on various amounts, and also interest at 3 per cent. on various other amounts. On December 16th Cochran wrote the plaintiff that he could not then send a check, and that it would be well to advise him in advance, and asked him concerning the rental of rooms. In the latter part of December, 1887, the plaintiff and Cochran had conversations concerning the condition of the business, Cochran expressing his dissatisfaction that the profits were so small, viz., about $8,000 per year, and early in January, 1888, Cochran demanded that the copartnership should be dissolved, and that the plaintiff give him a second mortgage for $65,-000 to secure the repayment of the moneys which Cochran claimed he had paid in and lost in and about the alterations and the copartnership, and that his relative Grimwood, his financial representative in the copartnership, be re-engaged by the plaintiff for five years at a salary of $4,400; and gave to the plaintiff a memorandum showing how he desired the proposed second mortgage, as well as the first one for $175,000, to be paid off. The plaintiff was unwilling to do this. Subsequently Cochran stated that he was advised that, instead of taking the mortgage, the plaintiff should assign the lease to him as additional security, and that Fitch would come in and leave a memorandum of the proposed details, which was subsequently done. That memorandum provided that the plaintiff should pay $50,000 per year for the first three years, and $60,000 per year for the balance of the term, and, when reduced to $100,000, the lease to be assigned to the plaintiff upon payment thereof, or a mortgage to be taken for that amount. The plaintiff objected to this proposition also, whereupon Cochran, according to the plaintiff's testimony, made emphatic threats. Shortly afterward Cochran brought to the plaintiff various papers, which he said the plaintiff must sign, and that an answer must be returned in three or four days; but in the meanwhile the plaintiff might submit the papers to his legal adviser, Mr. Thomas E. Stewart. Mr. Stewart returned the papers, with a letter commenting upon them, and making certain objections to them; among other things pointing out the large amount of "interest" the plaintiff would pay, and that he should not burden himself with such an "enormous interest account." On this letter Cochran wrote certain comments in pencil, but made no objection to the words "interest" or "interest account," and it is not claimed that the payments were rent, rather than interest. Upon the plaintiff again refusing to sign the papers desired, a further modification was made, reducing the amount to be paid so that it would be $43,000 per year

for three years, $53,000 per year for nine years, $55,000 per year for two years, and $58,000 per year for four years; the plaintiff to take the property at the end of 12 years at $185,000, or at the end of 18 years at $100,000. Upon the plaintiff again refusing, Cochran made a computation upon a piece of paper, which was put in evidence, by which it purports to appear that Cochran would make only a little more than $20,000 above the principal of his loan and 6 per cent. interest. This amount seems to have been arrived at in the following fashion:

| | | |
|---|---:|---:|
| Total payments of rent by Reich as above shown | $948,000 | |
| Last payment made by Reich provided for in defeasance agreement | 100,000 | |
|     Total | | $1,048,000 |
| Payments to be made by Cochran to the Astors, $25,000 per year for 18 years | $450,000 | |
| Interest on $275,000 at 6 per cent. for 18 years | 297,000 | |
| Principal loaned | 275,000 | |
|     Total | | 1,022,000 |
| Surplus over and above principal and interest, at 6 per cent. | | $ 26,000 |

Cochran continued to press for such an agreement, and the plaintiff continued his refusal. While the latter was sick in bed, Cochran and Stewart called upon him, and at this interview, so Stewart testified, Cochran assured the plaintiff that he wanted the lease only as security.

Finally, on February 11, 1888, the plaintiff yielded, and the papers were signed, being (1) a surrender of the lease by the firm of "L. Reich" to Lorenz Reich, the plaintiff; (2) an agreement for the dissolution of the firm of "L. Reich"; (3) assignment of the Astor lease by the plaintiff to Cochran; (4) bill of sale of the furniture in the hotel by "L. Reich" and the plaintiff to William F. Cochran; (5) lease by Cochran to the plaintiff of the same premises; (6) an agreement between Cochran and the plaintiff that the latter might reobtain possession of the Astor lease by paying Cochran $185,000 on May 1, 1900, or $100,000 on May 1, 1906; (7) an agreement between the same parties enumerating items and charges against the plaintiff, stating the amount of $275,000 as the consideration in the assignment of the Astor lease; and (8) an agreement as to certain mechanic's liens.

The plaintiff testified that before he signed these papers Cochran visited his room, and assured him that he took the lease only as security, and furthermore promised him that, if he would pay $6,000 within six months, he (Cochran) would reduce the rate of interest to whatever the plaintiff was able to pay. The plaintiff also testified that he had paid this $6,000 the first part of June, 1888, in the presence of his wife and Will K. Stevens. Stevens corroborated this testimony, and a check dated June 12, 1888, made by the plaintiff to his own order, was put in evidence in further corroboration, the proceeds of which check it was claimed furnished the money which was paid over. The plaintiff's wife did not corroborate this testimony, as she was not called as a witness. In March, 1891, the first or five-year

period of the lease then drawing to a close, and the construction of the Waldorf-Astoria Hotel on the opposite corner of the street then being under way, which resulted in great damage to the Cambridge Hotel, the question was agitated of securing some reduction of the rent reserved in the Reich lease from the Astor estate, which owned both properties. In the course of these negotiations Cochran wrote the plaintiff in reference to this subject as follows, "It seems as if you had an equitable claim." On April 28th a renewal of the lease was made by the trustees to Cochran and the plaintiff, and signed by Cochran on that day, but the plaintiff demurred to signing the same unless reductions could be obtained, as he testified, in the interest he was paying, and in the ground rent. This lease recites, among other things, that the plaintiff still retained a beneficial interest in the original Astor lease, and the rights of extension or renewal, and in respect of the compensation to be made for the additions and improvements, and that the receipt of the extension by Cochran is subject, as between him and the plaintiff, to the rights of the latter in the premises. Immediately thereafter, Cochran prepared a draft of a proposed new lease by himself to the plaintiff, to take effect May 1, 1891, with a rental of $48,000 per year for the first five years, $53,-000 per year for the next five years ending May 1, 1905, on which date the lease was to be assigned to the plaintiff if he so elected, Cochran to hold a mortgage on the same for $100,000, which sum was to be reduced at the rate of $15,000 per year, which, as the draft recited, "includes interest on the mortgage and will cancel the same in eight years." On June 12th, the plaintiff, so he testified, wrote to Cochran, asking concerning a lost memorandum and reminding him of his alleged promise to reduce the interest on the loan to $4\frac{1}{2}$ per cent., and take off the difference in the bonus, and suggesting that the principal, less the $100,000 to be paid by the Astor trustees, be repaid in 15 years from May 1, 1891. It is asserted that this letter was never received, and in the letter sent shortly afterward by Cochran to the plaintiff there is no reference to it or its contents sufficiently definite to establish its receipt. On June 16th the plaintiff again wrote Cochran, in a letter admitted to have been received, that the books showed a loss of $33,000 from the beginning of the enterprise up to the time of Cochran's withdrawal, and that it would yield only $2\frac{1}{4}$ per cent. net on the amount they had put into it; that he would not be warranted in paying more than 4 per cent. on the principal sum of his indebtedness to Cochran, and offering to transfer the entire business to Cochran in exchange for a release and a payment of one-half the money he (the plaintiff) had put into it. After some further correspondence in regard to procuring a reduction in the amount of ground rent charged by the Astor estate, the plaintiff claims to have written Cochran again on June 24th, reminding him of the reduction of interest, and calling his attention to his own figuring on the reduction of 2 per cent. on $275,000, making $5,500, and his statement in conclusion that the new arrangement would give a reduction of $8,000 annually until the $175,000 are paid up, and recalling also his statement that Astor would give a reduction of $5,000 annually on the ground rent; inquiring also as to how

the reduction for $8,000 was made up, and reminding him of his statement that he would give the plaintiff a private letter in which he would bind himself to return to the plaintiff in 1896 $50,000, so that he would get only 4 per cent. on the money actually loaned. After still further correspondence, the plaintiff claims to have written Cochran on June 27th, reminding him that when he asked for $6,000 the plaintiff was to give him within six months, Cochran promised in return to reduce excessive interest, and stating further that, as the plaintiff had only his verbal promise, it looked as though he would take advantage of the plaintiff, because he sent no answer to the plaintiff's letter of the day before, nor the proposed letter to Astor, wherein he was to promise to reduce interest if Astor would give a reduction of rent. ·

It is denied on behalf of the defendants, by their counsel, that some of these letters claimed to have been sent by the plaintiff to Cochran were in fact ever sent, the claim being made that they were concocted after the plaintiff was in desperate straits, with the deliberate purpose of subsequently claiming usury, and thus freeing himself from Cochran's entire claim.   On June 27th, however, Cochran wrote to the plaintiff, assuring the latter that he could rely upon Cochran's fulfilling every agreement, oral or written, but making no denial of the statement alleged to have been contained in the letter of the same date, which it is claimed the plaintiff sent to him.   Neither is it explained by the defense to what this assurance did relate, nor is any other letter from the plaintiff to Cochran to which it could have been in response offered in evidence.   This circumstance, therefore, lends strong corroboration to the plaintiff's assertions in regard to the correspondence and the contents of the letters he claims to have sent, and copies of which he produced in evidence, but the receipt of which is denied by the defense.   The fact that Cochran himself was not put on the stand as a witness to contradict the plaintiff on this point and others, as well as the testimony of Stevens and Stewart, is significant.

A few months after this, on September 19, 1891, the litigation between the parties, which has proved so involved and protracted, was begun by the filing of a petition in summary proceedings in the district court in the city of New York for the Sixth Judicial District, by Cochran, to dispossess the plaintiff.   On the same day the plaintiff wrote to Cochran, complaining of the proceedings, and that he understood that everything was settled between them, and that Cochran would keep the contract, which was for 4 per cent. interest, and asked why he (Cochran) did not tell him of such proceedings.   On the same date Cochran acknowledged the receipt of the plaintiff's note, and stated that he did not know what papers had been served, and that his instructions to his attorney did not contemplate any other arrangement than he had advised the plaintiff.   On the 30th day of September the taxes were paid, and the summary proceedings discontinued.   In the same month—September, 1891—an action was begun in the Supreme Court, Westchester county, on a note given by the plaintiff in payment of rent due under the lease in suit, in which action the defense of usury was pleaded, the answer

being verified on October 5, 1891. On November 5th of the same year, a suit was commenced by the plaintiff against Cochran in the Supreme Court of this county to set aside and cancel, as part of a usurious mortgage, the lease from Cochran to the plaintiff, and on November 7th a motion in that suit was argued before Mr. Justice Lawrence for an injunction restraining Cochran from dispossessing the plaintiff, which motion was denied on December 17th. Twice subsequently dispossess proceedings were commenced for successive quarterly installments, the rent being paid in each case, and the proceeding thus terminated. Finally, in August, 1892, another summary proceeding was commenced to dispossess the plaintiff, and it is this proceeding which is the most strenuously assailed in the present suit, as it has stood, so far successfully, in the way of the repeated efforts of the plaintiff to obtain an adjudication upon his claim that there was usury in his various contracts with the defendant.

The details of this proceeding, necessary to be stated, are as follows: The statutory notice required by section 2231 of the Code of Civil Procedure, demanding the payment of the rent, is claimed by the defendants to have been served on the plaintiff in New York City, on August 5th, by one Bagg. That the plaintiff was not in New York City on that day, nor for some days preceding and following, is abundantly established by evidence not necessary to be reviewed, it being sufficient to say that several persons, among them guests at his summer house at Brentwood, Long Island, testified that they were with him constantly at that place during the days mentioned. The petition in the proceeding is dated August 9th. A precept was issued, returnable on August 17th. When the case was called in the Sixth District Court, an attorney named Hewitt answered, and asked for an adjournment. Hewitt had been met that morning on the courthouse steps by the plaintiff's attorney, and had been asked to make this request for an adjournment, the attorney explaining that he could not remain because of other engagements. Hewitt and the plaintiff's attorney had never met until this occasion, and Hewitt's appearance was entirely accidental and casual. The circumstances of the case were not explained to him, nor was he asked to do anything more than to request an adjournment, which he did, but which was refused by the justice presiding on that occasion, in the absence of the justice of the said court. After some colloquy between the justice and Cochran's attorney, which Hewitt could not recall at the trial, the justice refused an adjournment, and a final order was rendered in favor of the petitioner that a warrant issue, but a stay until the next day was granted. It is claimed on behalf of the plaintiff that the justice who regularly presided in that court was familiar with the summary proceedings theretofore had between the parties, and with the fact that the rent was uniformly paid after the institution of the proceeding; this course being deemed advisable by the plaintiff's attorney, in order to preserve his rights by not appearing to waive his defense of usury by acquiescing in the payment of rent, or any other recognition of the existence of the relation of landlord and tenant, except under compulsion. But, how-

ever this may be, the fact is that the adjudication which has heretofore blocked every effort made on behalf of the plaintiff to obtain a hearing upon his defense of usury in a case involving hundreds of thousand of dollars was obtained on a midsummer morning in the summary, casual, and otherwise extraordinary manner above explained.

Shortly after this final order was obtained, leave was procured to serve a supplemental answer setting up this adjudication in the suit which the plaintiff had commenced against Cochran, as above stated, to set aside and cancel the lease as usurious. As a consequence, when that action came on to be tried in the Supreme Court before Mr. Justice Ingraham, the complaint was dismissed on the ground that the final order was an adjudication conclusive between the parties that the relation of landlord and tenant existed between them, which necessarily involved an adjudication that the lease was a valid one, and untainted with usury. An appeal was taken from this decision, but it was sustained in the General Term (74 Hun, 551, 26 N. Y. Supp. 443) and in the Court of Appeals (151 N. Y. 122, 45 N. E. 367, 37 L. R. A. 805, 56 Am. St. Rep. 607).

Shortly after the decision of Mr. Justice Ingraham just referred to, a motion was made in the summary proceedings in the Sixth District Court for an order opening the default of August 17th, which motion was denied on the ground, among others, of lack of power, and upon appeal to the Appellate Term (20 Misc. Rep. 593, 46 N. Y. Supp. 441) it was held that no such power resided in the trial justice in the case of summary proceedings as distinguished from actions, the opinion concluding as follows: "So that, irrespective of the merits (if any there were), the application was properly denied." A motion was also made before Mr. Justice Ingraham to open the judgment taken before him, in order that the case might be tried on its merits; but this motion was not argued until after another summary proceeding to dispossess the plaintiff had been instituted, in which an attempt was made to set up the defense of usury, but the district court refused to entertain such defense, holding that the lease was a valid instrument, and that the judgment so rendered by Mr. Justice Ingraham was conclusive as to all matters adjudicated thereby, or which the parties might have litigated as an incident to the subject-matter of the litigation, which decision was upheld on appeal. 20 Misc. Rep. 623, 46 N. Y. Supp. 443. In pursuance of the final order in that proceeding, the plaintiff was dispossessed on March 17, 1893. Subsequently, and on June 30, 1893, the motion to open the judgment just referred to was denied by Mr. Justice Ingraham. Subsequently, and in the year 1895, two other judgments were taken by Cochran against the plaintiff in actions brought upon notes given in payment of or upon demands for rent accruing under the lease. One of these actions was tried before Hamilton Odell, Esq., as referee, and the other was tried before Mr. Justice Dugro, and in both actions the final order in the Sixth District Court and the judgment in the action before Mr. Justice Ingraham were held to constitute a bar to the plaintiff's efforts to set up the defense of usury.

In the determination of this case two questions arise: (1) Was there usury in the transactions between the plaintiff and Cochran, so as to taint and invalidate the final contracts between them? and (2) is the situation such that the plaintiff should be permitted to have the various judgments rendered against him set aside, in order that he may avail himself of this defense of usury?

I am satisfied, from an examination of all the evidence in the case, that such contracts were intended to be and were usurious. From the time of the first loan up to the time when the plaintiff was finally dispossessed from the premises there is apparent a steady purpose on the part of Cochran to exact and receive more than the legal rate of interest. This purpose was more or less disguised under various forms of agreements, such as the copartnership agreement, and finally the assignment with the defeasance clause, and the lease by Cochran to the plaintiff, but through all these changes the relations between the parties seem clearly to be those of debtor and creditor, the plaintiff remaining always in possession of the property, and paying money to Cochran, sometimes in the form of profits of the copartnership and sometimes in the form of rent, and again in the form of the free use of apartments, but always in reality as interest, and in excess of 6 per cent.; and with equal uniformity the amount the plaintiff was bound to pay to recover his property was increased by the full amount of the various advances and investments of Cochran, even by the sum put in as a contribution when he entered as a copartner, and which, on his theory that the copartnership was insolvent, he was not entitled to claim as a loan to the plaintiff. I am not unmindful of the fact that the plaintiff is contradicted, and to some extent discredited, in his testimony; but, on the other hand, he is powerfully corroborated in his claim that the assignment of the lease was given merely as security, and that the sums he paid were paid as interest. Thomas E. Stewart, a reputable member of the bar, testified unqualifiedly that at the time Cochran was pressing the plaintiff to make this assignment he admitted that he wished it merely as security for the amount due.

There is the further circumstance that in one of Cochran's letters to the plaintiff he virtually admits that there was some oral understanding between them when he assures the plaintiff that the latter can depend upon his fulfilling every agreement, oral or written. There is also apparent in the correspondence which admittedly passed between them, even after leaving out of account the letters which it is denied that Cochran ever received, the existence of some understanding between them which Cochran was unwilling to have reduced to writing, and which the plaintiff was growing increasingly anxious to have put in that form. There is also the fact that in an agreement made May 1, 1887, there was a provision for the payment of 6 per cent. interest upon such portion of the $175,000 therein mentioned as was advanced prior to April 1, 1887, and upon the residue thereof at the rate of 3 per cent. per annum from the 1st day of April, 1887, since which time it was stated in the agreement such balance had been held and would be held in reserve by Cochran. That this 3 per cent. was collected at least a portion of the time appears from the evidence. ' Nevertheless, as appears by a letter written by

Cochran to the plaintiff, this money was not held in readiness, or at all times, but, on the contrary, Cochran complained because the plaintiff had not informed him in advance when the money was needed. Then, too, there is the testimony of the witness Stevens, who corroborates the plaintiff's statements that Cochran, in conversation with the plaintiff, spoke of the payments as "interest." Furthermore, there is the letter of Stewart, in which the payments of so-called rent were designated as "interest," on which letter Cochran penciled some replying notes, but did not object to the word "interest."

There remains the question whether or not, usury being established, the plaintiff should be permitted at this late day to have the various adjudications set aside, in order that he may avail himself of such defense. On behalf of the defendants it is strongly urged that an action in equity to set aside a judgment can be sustained only upon the allegation of fraud in the concoction of the judgment (citing Mayor v. Brady, 115 N. Y. 599, 22 N. E. 237; Stilwell v. Carpenter, 59 N. Y. 414; Ross v. Wood, 70 N. Y. 8; Smith v. Nelson, 62 N. Y. 287; Sanders v. Soutter, 126 N. Y. 199, 27 N. E. 263; Black Judg. § 367), and that it is an established principle that where, as here, the ground for seeking relief is simply the negligence or incompetence of the attorney, without fraud, the proceeding must be upon motion in the action; and the broad distinction is pointed out between the effect of setting aside a judgment by an independent action, and merely vacating and opening it by a motion in the same action; the proceeding in the latter case being preserved up to the time of the judgment, and a new trial granted, while in the former the entire proceeding is nullified and terminated. I do not conceive, however, that the effect of the authorities just cited is to deny an applicant all relief in a case where only negligence is shown, and where the remedy by motion would be impracticable. Unless he can show fraud, the rule is to relegate him to a motion as the preferable proceeding. There may, nevertheless, be a case so exceptional in its features that an action, rather than a motion, will better answer the purposes of justice, and such, I think, this case is. The real consideration which should guide courts in determining whether to grant relief, either by motion or by separate suit, is well expressed in the following words used in Levy v. Joyce, 14 N. Y. Super. Ct. 622, 625, quoted with approval in Gideon v. Dwyer, 17 Misc. Rep. 233, 40 N. Y. Supp. 1053, affirmed 7 App. Div. 608, 41 N. Y. Supp. 1116:

"There may be a case so novel and peculiar in its nature, in which it is so palpable that actual injustice may and probably has been done, and where there are no other means of relief, that the court will feel bound to relieve the party from the consequence of the inadvertence and mistake of his counsel, although it arose from a misapprehension of the law or rules of practice, if that can be done without prejudice to the rights of the other parties; by which is meant without any loss to them other than such as may necessarily result from establishing what may be shown to be the rights of the party applying."

Assuming, then, that relief should be granted, the only question is in what form—by motion or by action? Under the peculiar facts

shown, the remedy by motion would be complicated and cumbersome, if not wholly ineffectual; and, furthermore, in view of the disposition I intend to make of it, there is not the necessity that usually exists for leaving the proceeding unimpaired and in condition for a retrial. The remedy by motion in this case would not be the preferable proceeding for the reason that, if such motion were made to set aside the final order of August 17, 1892, obtained in the district court, and such motion were granted, the plaintiff would immediately be met by the judgment taken in the Supreme Court before Mr. Justice Ingraham. If a motion were made in the latter action to set aside that judgment, and should be granted, the plaintiff would be confronted by the judgment taken before Hamilton Odell, Esq., as referee, and by the various other judgments and final orders above referred to. And so it would continue through the long line of adjudications existing between the parties. To move simultaneously in all of these various actions and proceedings would be impracticable. My conclusion is that the same reasons of convenience of practice, and effectiveness of remedy, and equity between the parties, which generally favor the proceeding by motion rather than by suit, under the peculiar and extraordinary circumstances of the present case, favor the opposite practice. Without going at greater length into the facts, it is enough to say that, without any reflection upon the integrity of the plaintiff's distinguished and able former attorney, and although the allegations of fraud against him were unsupported by any vestige of proof, nevertheless there has been such a series of missteps and delays and oversights in the various actions and proceedings, unnecessary to detail here, that I am abundantly satisfied that the plaintiff should have relief even at this late day. Such relief, however, should be granted, and the judgments and orders set aside, and the lease declared a mortgage, only upon condition that the plaintiff, within the time to be fixed by the decision and judgment, pay to the present defendants the amount of the various loans made by their testator, with interest, the plaintiff being credited toward such payments with the various amounts he paid as rent while in possession of the premises, and also with the net rents and profits of the property since he was dispossessed.

On behalf of the plaintiff, it is strenuously insisted that the court has no power to impose the above condition that the amount due, with lawful interest, shall be paid as a condition to granting relief, it being claimed that such power is taken away by the statute (1 Rev. St. [1st Ed.] p. 772, pt. 2, c. 4, tit. 3, § 8), which declares that: "Whenever any borrower of any money, goods or things in action, shall file a bill in chancery for a discovery of the money, goods or things in action taken or received, in violation of either of the foregoing provisions, it shall not be necessary for him to pay, or offer to pay, any interest whatever on the sum or thing loaned, nor shall any court of equity, require or compel the payment or deposit of the principal sum or any part thereof, as a condition of granting relief, to the borrower, in any case of a usurious loan, forbidden by this chapter;" citing Williams v. Fitzhugh, 37 N. Y. 444; Birdsall v. Patterson, 51 N. Y. 43; Minturn v. Farmers' Loan & Trust Co., 3 N. Y.

498; Vilas v. Jones, 1 N. Y. 274; Rexford v. Widger, 2 N. Y. 131; Schermerhorn v. Talman, 14 N. Y. 93; Curtis v. Leavitt, 15 N. Y. 9; Allerton v. Belden, 49 N. Y. 373; Wheelock v. Lee, 64 N. Y. 242; Bissell v. Kellogg, 60 Barb. 617, affirmed 65 N. Y. 432; Buckingham v. Corning, 91 N. Y. 525.

The statutory inhibition above quoted does not restrain the court in this case, in my opinion, because the relief granted is not against usury alone primarily, but is against a series of adjudications which have been obtained against the plaintiff, and which he asks a court of equity to set aside. Such being the situation, it is entirely competent for the court to inquire what use the suitor intends to make of the freedom he seeks at the hands of the court, and if it is apparent that he purposes to defeat the creditor's claim to principal and lawful interest, the court clearly has the power, notwithstanding the statute above cited, to impose such terms as conscience requires, not as a condition to granting relief against usury, but against the judgments.

Let a decision and judgment in accordance with the views above expressed be submitted for settlement upon eight days' notice, at which time the question of costs will be determined.

Judgment accordingly.